Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Frank P. Tiscione (FT 5396)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE  COMPANY and GEICO CASUALTY
COMPANY,

                     Plaintiffs,

      -against-

JAMAICA AVENUE CHIROPRACTIC, P.C.,
MARK  HEYLIGERS,  D.C.,  and  DAVID  KRESHOVER,
D.C.,

                Defendants.

-------------------------------------------------------------------X

Docket No.:_____ (        )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

    Plaintiffs  Government  Employees  Insurance  Company,  GEICO  Indemnity  Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

    1.    GEICO  brings  this  action  to  recover  more  than  $28,000.00  that  Defendants

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault insurance charges for useless, medically unnecessary and illusory alleged

electro-diagnostic tests billed as "pain fiber sensory nerve conduction tests" (the "Fraudulent Services"), and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $489,000.00 in pending charges submitted under the name of a professional corporation known as Jamaica Avenue Chiropractic, P.C. ("Jamaica Chiropractic").

2.    Jamaica Chiropractic purports to be a legitimate professional corporation, but it has no treatment office of its own, has no patients of its own, and provides no legitimate or medically necessary services.  Instead, Defendants operate Jamaica Chiropractic on a transient basis from several no-fault medical "clinics," which serve as referral sources that, in return for payments and/or kickbacks, provide Jamaica Chiropractic with access to the clinics' patients in order to perform the medically useless Fraudulent Services.

3.    Jamaica Chiropractic, along with its purported owners, Mark Heyligers, D.C. ("Heyligers") and David Kreshover, D.C. ("Kreshover"), submit inflated charges to GEICO using the billing code for a nerve conduction study after allegedly performing the Fraudulent Services on individuals who were involved in automobile accidents and eligible for insurance coverage under GEICO insurance policies ("Insureds") -- even though the tests do not, and cannot, provide any relevant diagnostic information and do not amount to an actual nerve conduction study.  Defendants do this as a part of a scheme to exploit New York's "No-Fault" insurance system.

4.    GEICO is entitled to both recover the monies stolen from it and obtain a declaration that it is not legally obligated to pay reimbursement of the pending no-fault insurance claims submitted by or on behalf of Defendants because:

(i)    the Fraudulent Services are not medically necessary and are provided – to the extent they are provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to

2

treat or otherwise benefit the Insureds who purportedly are subjected to them;

    (ii)    the billing codes used for the Fraudulent Services misrepresent and exaggerate the level and type of services that purportedly are provided in order to inflate the charges submitted to GEICO; and

    (iii)    the Fraudulent Services are provided – to the extent they are provided at all – pursuant to illegal kickback arrangements between Defendants and others.

5.    The Defendants fall into the following categories:

    (i)    Defendant Jamaica Chiropractic is a New York professional corporation through which the Fraudulent Services purportedly are performed and are billed to automobile insurance companies, including GEICO.

    (ii)    Heyligers and Kreshover are licensed chiropractors who purportedly own Jamaica Chiropractic, and pay kickbacks for patient referrals to the owners and controllers of the multi-disciplinary no-fault clinics from which Jamaica Chiropractic operates, and cause Insureds to be subjected to the Fraudulent Services.

6.    As discussed below, Defendants at all relevant times have known that:

    (i)    the Fraudulent Services are not medically necessary and are provided – to the extent they are provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly are subjected to them;

    (ii)    the billing codes used for the Fraudulent Services misrepresent and exaggerate the level and type of services that purportedly are provided in order to inflate the charges submitted to GEICO; and

    (iii)    the Fraudulent Services are provided – to the extent they are provided at all – pursuant to illegal kickback arrangements between Defendants and others.

7.    As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through Jamaica Chiropractic.

8.    The chart annexed hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to-date that Defendants have submitted, or caused to be submitted, to GEICO.

3

9.     The Defendants' fraudulent scheme began as early as 2012 and has continued uninterrupted through present day.

## THE PARTIES

### I.    Plaintiffs

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   Defendants

11.     Defendant Heyligers resides in and is a citizen of New York. Heyligers was licensed to practice chiropractic in New York on May 9, 1980 and serves as the purported owner of Jamaica Chiropractic.

12.     Heyligers uses Jamaica Chiropractic to bill insurance companies for the Fraudulent Services.

13.     Defendant Kreshover resides in and is a citizen of New York. Kreshover was licensed to practice chiropractic in New York on February 12, 1998 and serves as the purported owner of Jamaica Chiropractic.

14.     Kreshover uses Jamaica Chiropractic to bill insurance companies for the Fraudulent Services.

15.     Defendant Jamaica Chiropractic is a New York medical professional corporation incorporated on or about May 22, 2009, through which the Fraudulent Services have been billed to insurance companies, including GEICO.

4

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside, and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the No-Fault Laws and Licensing Statutes

18.     GEICO underwrites automobile insurance in New York.

19.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

20.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

21.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including chiropractic services.

22.     In New York, an Insured can assign his/her right to No-Fault Benefits to health care goods and service providers in exchange for those services.

23.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary

services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

24.     In the alternative, a healthcare service provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

25.     Pursuant to the New York no-fault insurance laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

26.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

27.     New York law prohibits licensed healthcare service providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

28.     Pursuant to Education Law §6512, §6530 (11), and (18), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

29.     Pursuant to Education Law § 6509-a, it is professional misconduct under certain circumstances for a licensee to "directly or indirectly" request, receive, or participate in the division, transference, assignment, rebate, splitting, or refunding of a fee.

30.     Pursuant to 8 N.Y.C.R.R. §29.1(b)(3), a licensee is precluded from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

31.     Pursuant to Education Law §6530(19), it is professional misconduct under certain circumstances for a licensee to permit any person to share in fees for professional services.

32.     Therefore, under the New York No-Fault insurance laws, a healthcare service provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, or if it engages in illegal self-referrals.

33.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

34.     Pursuant to the New York No-Fault insurance laws, only healthcare service providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare service provider. The implementing

regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

35.    Accordingly, for a healthcare service provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the New York no-fault insurance laws, a healthcare service provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

36.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Defendants' Fraudulent Scheme

37.    Beginning in 2012, and continuing through the present day, Defendants masterminded and implemented a fraudulent scheme in which they billed GEICO and other automobile insurers hundreds of thousands of dollars for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services.

38.    Despite purporting to be a legitimately owned and operating chiropractic professional corporation, Jamaica Chiropractic has no internet website or otherwise advertises for

8

patients, is not the owner or leaseholder, of the real property from which it purports to provide the Fraudulent Services, and indeed, provides no legitimate or medically necessary services.

39.    In fact, Jamaica Chiropractic operates on a transient basis from several multidisciplinary no-fault clinics located throughout the New York City area ("Clinics") where each Insured is subjected to a cookie-cutter pattern of predetermined treatment.  In exchange for payment of fees for referrals and/or kickbacks to the owners of the Clinics, Defendants gain access to Insureds, which in turn permits Defendants to bill for the Fraudulent Services under the name of Jamaica Chiropractic.

40.    Jamaica Chiropractic, to effectuate the fraudulent scheme, associates itself with a purported billing company, HIJ Billing Services, Inc. ("HIJ Billing").

41.    HIJ Billing is not actually a mere billing company, but instead supplies all of the testing equipment, the technicians, and the paperwork to perform and document the Fraudulent Services -- known alternatively as pain fiber sensory nerve conduction tests, PfNCS tests, voltage-actuated sensory nerve conduction threshold tests, and/or VsNCT tests ("collectively, "PfNCS tests").

42.    Moreover, the PfNCS tests allegedly performed under the name of Jamaica Chiropractic are uniformly billed under AMA CPT Codes for nerve conduction studies, even though Defendants know that the Fraudulent Services do not consist of actual nerve conduction studies and do not meet the requirements under the codes used, pursuant to the governing schedule for reimbursement of health care services under New York's No-fault laws and regulations.

**A.    Relationship with HIJ Billing Services, Inc.**

43.    HIJ Billing is owned by Jesse Haber ("Haber").

44.     HIJ Billing owns the testing equipment used to perform the testing services that are billed under the Jamaica Chiropractic name.

45.     HIJ Billing supplies the technicians used to perform the testing services that are billed under the Jamaica Chiropractic name.

46.     HIJ Billing creates the paperwork, including the bills, letters of medical necessity, and reports, used to bill the testing services to insurers under the Jamaica Chiropractic name.

47.     Despite the fact that HIJ Billing controls all aspects of the testing, HIJ submits the billing under the healthcare provider's name, *i.e.*, Jamaica Chiropractic, as if a licensed chiropractor rendered the tests.

48.     HIJ Billing generates income for itself that is directly dependent on how much testing is performed under the name of Jamaica Chiropractic.

49.     HIJ Billing and Haber have a history of controlling testing performed under the names of numerous professional corporations, in order to submit large-scale fraudulent no-fault billing to New York automobile insurers, including GEICO.

50.     HIJ Billing provides purported billing and other services specifically for PfNCS tests for at least twenty-five (25) chiropractic healthcare providers or individual chiropractors.

51.     Not surprisingly, several of these chiropractic providers and/or chiropractors were sued by New York automobile insurers challenging the validity of the billing and treatment protocols that had been employed, and/or for engaging in illegal kickbacks.

52.     The similarities between these professional corporations associated with HIJ Billing and their billing and treatment protocols are beyond striking.  For example:

- The billing always has a cover sheet stating, "For This Bill Only";
- HIJ submits bills for CPT code 95904 only;
- Bills always follow the same format regardless of the provider;

10

- The bill submitted always list the chiropractor as the person rendering the treatment, not the technician who purported to actually render the treatment;
- The letterhead summary of the results is always in the same format regardless of the provider;
- The results data chart are in the same format for every provider;
- The examination reports are always in the same format for every provider; and
- A screen shot of the wave results is always included.

53.    The scheme is clear:  HIJ Billing and Haber work with numerous chiropractor providers, who render purported treatment at various Clinics, and then are used to submit excessive billing for PfNCS tests in order for the providers (including Jamaica Chiropractic), HIJ Billing, and Haber to obtain ill-gotten monies from New York automobile insurers, including GEICO.

**B.    Defendants' Illegal Kickback Scheme**

54.    Jamaica operates from several multidisciplinary clinics, including, but not limited to, the following locations:

(i)      100-05 Roosevelt Avenue, Corona, NY

(ii)     127 East 107th Street, New York, NY;

(iii)    215-33 Jamaica Avenue, Queens Village, NY;

(iv)    2367 Westchester Avenue, Bronx, NY;

55.    Though ostensibly organized to provide a range of healthcare services to Insureds at individual locations, these Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

56.    For example, GEICO received billing for purported healthcare services rendered at the 100-05 Roosevelt Avenue, Corona Clinic from a "revolving door" of more than 45 purportedly different healthcare providers, including a number of professional corporations operated by individuals previously identified by the US Government as owning one or more

professional corporations being used in furtherance of an organized No Fault fraud crime ring. See United States of America v. Zemlyansky, 12-CR-00171 (S.D.N.Y. 2012)(JPO).

57.     In addition, GEICO received billing for purported healthcare services rendered at the 2367 Westchester Avenue, Bronx Clinic from a "revolving door" of more than 45 purportedly different healthcare providers, including professional corporations that have been identified by the US Government as being used "solely" in furtherance of an organized No Fault fraud crime ring.  See United States of America v. Zemlyansky, 12-CR-00171 (S.D.N.Y. 2012) (JPO).

58.     Similarly, GEICO received billing for purported healthcare services rendered at the 127 East 107th Street, New York Clinic from a "revolving door" of more than 35 purportedly different healthcare providers.

59.     Defendants, using Jamaica Chiropractic, submit charges for medically unnecessary electro-diagnostic testing services purportedly rendered at the Clinics as part of the Clinics' exploitation of the Insured' insurance benefits.

60.     Defendants, in exchange for payment of fees for referrals and/or kickbacks to the owners of the Clinics, gain access to Insureds, which in turn permits Defendants to bill for bogus and fraudulent services under the name of Jamaica Chiropractic.

61.     The kickbacks are disguised as ostensibly legitimate fees to "lease" space or personnel.  In fact, these are "pay-to-play" arrangements that cause the individuals and entities at the Clinics to provide access to Insureds and to refer the Insureds to Defendants for the Fraudulent Services without regard for the medical necessity of any of the Fraudulent Services.

62.     In exchange for these kickbacks from Defendants, Insureds are automatically referred to Defendants for the medically-unnecessary Fraudulent Services, regardless of the Insureds' individual circumstances or presentment.

63.     Upon information and belief, the Clinics use individuals known as "Runners" who recruit patients to come to the Clinics for treatment.  These Runners are paid cash kickbacks for each patient referral.

64.     Under the direction and control of the various controllers of the No-Fault Clinics where Jamaica Chiropractic operates, and often with coaching by the Runners, the patients that are recruited to treat with Jamaica Chiropractic and the Clinics and are subjected to a medically unnecessary course of "treatment" that is provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that could be submitted to insurers.

65.     The kickbacks that Defendants pay in order to gain access to the various patient bases are disguised as ostensibly legitimate fees, with the amount of the payments to be made based upon the volume of Insureds that are "referred" to Jamaica Chiropractic for "testing."

66.     In February 2012, an indictment (the "February 2012 Indictment") in USA v. Zemlyansky, et al., Docket No. 1:12-cr-00171 (JPO)(the "Zemlyansky Action") was unsealed in the United States District Court for the Southern District of New York, charging various laypersons and medical professionals with RICO Conspiracy, Conspiracy to Commit Health Care Fraud, Conspiracy to Commit Mail Fraud, and Conspiracy to Commit Money Laundering. The February 2012 Indictment explained the mechanics of the suspect No-Fault clinics' operations as follows:

> 4. In order to take advantage of the patient-friendly provisions of the No-Fault Law, numerous medical clinics were created solely to defraud insurance companies under the No-Fault Law (the "No-Fault Clinics").  While purporting to be legitimate medical care clinics specializing in treating the Patients, the No-

13

Fault Clinics were, in fact, medical fraud mills that routinely billed automobile insurance companies under the No-Fault Law for medical treatments that were either (i) never provided and/or (ii) unnecessary, because the Patients did not medically need the treatments.

67. The February 2012 Indictment explained the use of Runners and the kickback procedure as follows:

> 7. [T]he [individuals who controlled the Clinics] arranged for other . . . entities to provide excessive and unnecessary medical treatments based on referrals from the No-Fault Doctors (the "Modality Clinics"). The Modality Clinics [such as Jamaica Chiropractic in the present case] provided additional medical treatments and supplies, which were fraudulently billed to the automobile insurance companies. In return, the [individuals who controlled the Clinics] received cash kickbacks for each referral from other individuals who . . . owned, operated and controlled the Modality Clinics (the "Modality Clinic Controllers").

> 8. …[T]he No-Fault Clinic Controllers used individuals who recruited Patients to the No-Fault Clinics (the "Runners"). The No-Fault Clinic Controllers generally paid the Runners between $2,000 and $3,000 per Patient referral... Often the Runners coached the Patients about which fake injuries they should claim….

*          *

> 11. [A]s described above, the Modality Clinic Controllers paid kickbacks to the [individuals who controlled the Clinics] in return for Patient referrals. The Modality Clinic Controllers paid a portion of the kickback money to the [individuals who controlled the Clinics] by providing checks to, the No-Fault Clinic Accounts that were often falsely characterized as "rent" payments for the use of space at the No-Fault Clinics by the Modality Clinics. These "rent" checks had the dual purpose of satisfying some of the monies owed for kickbacks and also falsely representing to the automobile insurance companies that the business relationship between the No-Fault Clinics and the Modality Clinics was legitimate. Additionally, other expenses of the No-Fault Clinics were sometimes paid by check directly from the Modality Clinic Accounts as an additional means of making kickback payments to the [individuals who controlled the No-Fault Clinics]. Finally, on some occasions, the Modality Clinic Controllers paid a portion of the kickbacks owed to the [individuals who controlled the No-Fault Clinics] by structuring checks of less than $10,000 to the [individuals who controlled the No-Fault Clinics], who, among other things, provided some of these checks to check cashers to convert to cash . . . .

68. The use of Runners and the unlawful kickback relationships are essential to the success of Defendants' fraudulent scheme. Defendants derived significant financial benefit from

these relationships because without access to Insureds provided by the Runners, the referring providers and/or other clinic controllers, Defendants would not have the ability to implement their fraudulent protocol, bill automobile insurers including GEICO, or generate income from insurance claim payments.

69.     The No-Fault Clinics likewise benefitted from their unlawful relationships with Defendants, not only because of the financial benefit conferred by the kickbacks themselves, but also because the fraudulent treatment reports and test results generated by Defendants were used to support the continuation of their own medically-unnecessary services to the Insureds.

70.     As the electro-diagnostic testing purportedly provided by Defendants was medically unnecessary, Defendants would not have had access to the No-Fault Clinics and the Insureds but for the payment of kickbacks.

**C.     The Defendants' Fraudulent Testing and Billing Protocol**

71.     Most of the Insureds who are referred to Jamaica Chiropractic are involved in relatively minor, "fender-bender" accidents, to the extent that they are involved in any actual accidents at all, and they had already received a myriad of evaluations, treatments, and diagnostic tests.

72.     Even so, Defendants purport to subject virtually every Insured to a medically unnecessary course of electro-diagnostic testing which is provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly are subjected to it.

73.     Defendants purport to provide their pre-determined fraudulent testing and treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentation.

74.    No legitimate healthcare professional would permit the fraudulent testing and billing protocol described below to proceed under his or her auspices.

**D.    The Fraudulent Testing**

75.    As part of their fraudulent scheme, Defendants purport to subject Insureds to a series of medically unnecessary and useless pain fiber sensory nerve tests, alternatively known as PfNCS tests, voltage-actuated sensory nerve conduction threshold tests, and/or VsNCT tests (collectively, "PfNCS tests").

76.    Defendants bill the PfNCS tests to GEICO as multiple charges under CPT code 95904, generally resulting in charges of approximately $1,000.00 to $1,300.00 for each Insured on whom the PfNCS testing purportedly is performed.

77.    The charges for the PfNCS tests are fraudulent in that (i) the PfNCS tests allegedly performed are uniformly billed under AMA CPT Codes for nerve conduction studies, even though Defendants know that Defendants' Fraudulent Services do not consist of actual nerve conduction studies and (ii) the PfNCS tests are medically unnecessary and are performed – to the extent that they are performed at all – pursuant to the fraudulent testing and treatment protocol instituted by Defendants and the kickbacks that Defendants pay to the Clinics, and not to benefit the Insureds who purportedly were subjected to them.

**a.    The Human Nervous System and Electro-diagnostic Testing**

78.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

79.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit

signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

80.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

81.    Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

82.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A disease or dysfunction of the peripheral nerves is called a neuropathy, and can cause various symptoms including pain, numbness, weakness, and reflex changes.

83.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electro-diagnostic medicine in the diagnosis of various forms of neuropathies and radiculopathies.

84.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electro-diagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

85.    The Recommended Policy does not identify PfNCS tests as having any documented usefulness in diagnosing radiculopathies.

### b.     Legitimate Tools for Neuropathy Diagnosis

86.     Defendants supposedly provide the PfNCS tests to Insureds in order to diagnose abnormalities in the Insureds' peripheral nerves and nerve roots.

87.     There are four primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities in the peripheral nerves and/or nerve roots.  These diagnostic tests are nerve conduction velocity ("NCV") tests, electromyography ("EMG") tests, computed tomography scans ("CT scans"), and magnetic resonance imaging tests ("MRIs").

88.     Except in very limited circumstances, for diagnostic purposes NCVs and EMGs are performed together if: (i) nerve damage is suspected following an auto accident; (ii) the damage cannot be fully evaluated through a physical examination or other generally accepted diagnostic technique; and (iii) the tests are necessary to determine an appropriate treatment plan.

89.     MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and nerves inside the human body. MRIs often are used following auto accidents to diagnose abnormalities in the peripheral nerves and nerve roots through images of the nerves, nerve roots and surrounding areas.

### c.     The Medically Useless PfNCS Tests

90.     The PfNCS test is a type of non-invasive sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots. It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

91.     Unlike NCV testing, PfNCS testing does not measure velocity, amplitude or latency.  In addition, Defendants did not measure an amplitude of the sensor neural action potential (SNAP), nor did it measure the latency or nerve conduction velocity.

18

92.     The PfNCS tests are performed by administering electricity through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and/or face. The voltage amplitude is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage. "Findings" then are made by recording the minimum voltage stimulus required for the patient to announce that he or she perceives a sensation.

93.     In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in PfNCS testing.

94.     If the patient's sensation threshold is greater than the purported "normal range" of voltage required to evoke a sensation, it allegedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function). If the voltage required for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it allegedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

95.     The PfNCS tests are medically useless because Insureds who purportedly are subjected to the PfNCS tests, upon information and belief, also receive, at or about the same time, NCVs, EMGs, and/or MRIs.

96.     The PfNCS tests purportedly provided by Defendants have no legitimate value. In fact, there is no legitimate data to support the use of PfNCS tests to diagnose neuropathies in general or radiculopathies in particular.

97.     There is also no reliable evidence of the existence of normal ranges of intensity or voltage required to evoke a sensation using a PfNCS test device. Given the lack of evidence of normal ranges of intensity or voltage required to evoke a sensation, it is impossible to determine whether any given Insured's personal PfNCS test results are or are not abnormal.

98.    Even if there was some evidence of the existence of normal ranges of intensity required to evoke a sensation using a PfNCS test device, there is no reliable evidence to prove that a sensation threshold greater than the normal range would indicate a hypoesthetic condition or that sensation threshold less than the normal range would indicate a hyperesthetic condition.

99.    Even if an abnormal sensation threshold indicated either a hypoesthetic or hyperesthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from PfNCS tests. Indeed, there are numerous pathological and physiological conditions other than peripheral nerve damage that can cause hyperesthesia and hypoesthesia.

100.    Furthermore, even if PfNCS tests could produce any valid diagnostic information regarding the sensory nerve fibers:

(i)    there is no reliable evidence to prove that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;

(ii)    there is no reliable evidence to prove that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;

(iii)    there is no reliable evidence to prove that any such information would indicate the specific location of the abnormality along the sensory nerve pathways;

(iv)    PfNCS tests do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident; and

(v)    there would be no legitimate diagnostic advantage to using PfNCS tests to obtain information regarding the sensory nerve fibers where, as here, the PfNCS tests were duplicative of the provided NCV tests, EMG tests, and MRIs.

101.    In keeping with the fact that Defendants' purported PfNCS tests are medically useless, the Centers for Medicare & Medicaid Services ("CMS") have determined that PfNCS

tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and radiculopathies and are therefore not compensable.

102.    In keeping with the fact that Defendants' putative PfNCS tests are medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for PfNCS tests.

### d.    Each of the Two Main PfNCS Test Device Manufacturers Claims the Other is a Fraud

103.    Until 2004, about the same time that CMS was considering the medical benefits of PfNCS testing before ultimately issuing its National Coverage Determination that denied Medicare coverage of PfNCS tests, the two primary manufacturers of sensory nerve conduction threshold devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

104.    Neurotron, Inc. manufactured a device called the "Neurometer". Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000". While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purported to provide quantitative data on sensory nerve conduction threshold.

105.    In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II".

106.    Neuro Diagnostic Associates, Inc.'s last known business address and telephone number is identical to that currently used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II.

107.    To the extent that Defendants actually provided any PfNCS tests to Insureds in the first instance, upon information and belief, they were provided using an Axon-II or re-branded Medi-Dx 7000 device.

108.    Notwithstanding the Medi-Dx 7000's cosmetic re-branding as the Axon-II, Neurotron, Inc. claims that neither device produces valid data or results, and that both the Medi-Dx 7000 and Axon-II have been fraudulently marketed. For its part, Neuro Diagnostic Associates, Inc. had asserted the same claims regarding Neurotron, Inc.'s Neurometer device.

109.    Among the charges made by Neurotron, Inc. against the Medi-Dx 7000 are that: (i) there is no reliable evidence that the type of electrical wave forms (asymmetrical wave forms) used by the Medi DX 7000 stimulate or provide any useful diagnostic information regarding any specific kind of sensory nerve fiber; (ii) the alternating output of electrical current used by the Medi-Dx 7000 is "severely distorted by skin impedance" (e.g., texture, thickness, temperature of the skin etc.) making it "impossible" to determine the true intensity levels of the electrical current being delivered by the Medi-Dx 7000; (iii) the Medi-Dx 7000 protocols are "incapable of measuring the thresholds in the sensory nerves"; and (iv) there are no peer-reviewed studies that validate the tests performed using the Medi-Dx 7000.

110.    Because the Axon-II is virtually identical to the Medi-Dx 7000, any and all of Neurotron, Inc.'s criticisms of the Medi-Dx 7000 also apply to the Axon-II/Medi-DX 7000 that is used by Defendants.

**III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

111.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports through Jamaica Chiropractic to GEICO seeking payment for the Fraudulent Services for which the Defendants are not entitled to receive payment.

112.    The NF-3 forms, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of Defendants are false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and/or treatment reports submitted by and on behalf of the Defendants uniformly misrepresent to GEICO that the Fraudulent Services are medically necessary.  In fact, the Fraudulent Services are not medically necessary, and are performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly are subjected to them.

(ii)    The NF-3 forms, HCFA-1500 forms, and/or treatment reports submitted by and on behalf of the Defendants uniformly fraudulently conceal the fact that the Fraudulent Services are provided – to the extent that they are provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

(iii)   The NF-3 forms, HCFA-1500 forms, and/or treatment reports submitted by and on behalf of Defendants uniformly misrepresent and exaggerate the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly are provided.

(iv)    The NF-3 forms, HCFA-1550 forms and/or treatment reports submitted by and on behalf of the Defendants uniformly sought reimbursement of Pf-NCS testing under the AMA CPT Codes for NCV testing but Defendants did not conduct a nerve conduction amplitude and latency/velocity study as PfNCS testing does not measure amplitude or latency.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

113.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the billing that they submit, or caused to be submitted, to GEICO.

114.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systemically conceal their fraud and went to great lengths to accomplish this concealment.

115.    Specifically, they knowingly misrepresent and conceal facts related to Jamaica Chiropractic in an effort to prevent discovery of the fact that Defendants unlawfully exchange kickbacks for patient referrals.

116.    Furthermore, Defendants knowingly misrepresent and conceal facts in order to prevent GEICO from discovering that the Fraudulent Services are medically unnecessary and performed pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly are subjected to the Fraudulent Services.

117.    In addition, in every bill that Defendants submit or caused to be submitted, Defendants uniformly conceal the fact that Defendants misrepresent and exaggerate the level and nature of the services purportedly provided, and inflated the billing to insurers.

118.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

119.    In accordance with the New York no-fault insurance laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

120.    Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

121.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $28,000.00 based upon the fraudulent charges.

122.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

123.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

124.    There is an actual case in controversy between GEICO and Defendants regarding more than $489,000.00 in fraudulent billing for the Fraudulent Services that have been submitted to GEICO under Jamaica Chiropractic.

125.    Defendants have no right to receive payment for any pending bills submitted to GEICO because Defendants engage in illegal kickback arrangements with unlicensed individuals and entities and, therefore, are ineligible to bill for or to collect No-Fault Benefits.

126.    Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services are not medically necessary and are provided – to the

extent they are provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly are subjected to them.

127.   Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresent and exaggerate the level of services that purportedly are provided in order to inflate the charges submitted to GEICO.

128.   Defendants have no right to receive payment for any pending bills submitted to GEICO because the NF-3 forms, HCFA-1550 forms and/or treatment reports submitted by and on behalf of the Defendants, which uniformly seek reimbursement of Pf-NCS testing under the AMA CPT Codes for NCV testing, were fraudulent.  Unlike NCV testing, Pf-NCS testing does not measure velocity, amplitude or latency.

129.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services are ordered and performed – to the extent that they are performed at all – pursuant to Defendants' illegal kickback arrangements;

(ii)    Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services are medically unnecessary and are ordered and performed – to the extent that they are performed at all – pursuant to fraudulent, pre-determined protocols designed solely to maximize charges to GEICO and other insurers, not because they are medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who purportedly have been subjected to them; and

(iii)   Defendants have no right to receive payment for any pending bills submitted to GEICO because the CPT codes used for the Fraudulent Services misrepresent and exaggerate the level of services that purportedly are provided in order to inflate the charges submitted to GEICO.

## SECOND CAUSE OF ACTION
**Against All Defendants**
**(Common Law Fraud)**

130.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

131.    Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

132.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: in every claim, (i) the representation that Jamaica Chiropractic is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engages in illegal kickback arrangements with unlicensed individuals; (ii) the representation that the billed-for services are properly billed in accordance with the Fee Schedule, when in fact the billed-for services are performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Defendants; (iii) the representation that the billed-for-services are medically necessary, when in fact they are not; and (iii) the representation that the charges are appropriate and consistent with the service provided, when in fact the charges exaggerate the level of service and the nature of the service that purportedly is provided.

133.    Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Jamaica Chiropractic that were not compensable under the No-Fault Laws.

27

134.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $28,000.00 pursuant to the fraudulent bills submitted by the Defendants through Jamaica Chiropractic.

135.   Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

136.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against All Defendants**
**(Unjust Enrichment)**

137.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

138.   As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

139.   When GEICO paid the bills and charges submitted by or on behalf of Jamaica Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

140.   Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

141.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

142.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $28,000.00.

## JURY DEMAND

143.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Defendants, including Jamaica Chiropractic, have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Defendants compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $28,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.    On the Third Cause of Action against Defendants, more than $28,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: December 16, 2016

RIVKIN RADLER LLP

By: _____
      Michael A. Sirignano (MS 5263)
      Barry I. Levy (BL 2190)
      Frank P. Tiscione (FT 5396)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

3464260

30